714 So.2d 1244 (1998)
Senator Cleo FIELDS, et al.
v.
STATE of Louisiana Through DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS and Richard L. Stalder, Secretary of Louisiana Department of Public Safety and Corrections.
No. 98-C-0611.
Supreme Court of Louisiana.
July 8, 1998.
*1246 Richard Phillip Ieyoub, Atty. Gen., Roy Achille Mongrue, Jr., Charles H. Braud, Jr., Stephen Alexander Quidd, Patricia Turner Riddick, Baton Rouge, James H. Brown, Jr., New Orleans, for Applicant.
Charles Roger Moore, Keith Patrick Richards, Moore, Walters, Shoenfelt & Thompson, Baton Rouge; Cleo Fields, Cheney C. Joseph, Jr., Charles roger Moore, Baton Rouge, for Respondent.
*1247 KIMBALL, Justice.[*]

ISSUE
Acts 1997, No. 1486 authorizes the impounding of a motor vehicle when the operator fails to present the statutorily required proof of insurance to an investigating officer. The trial court declared portions of this Act to be an unconstitutional violation of the right to due process under the Fourteenth Amendment to the United States Constitution and Art. I, § 2 of the Louisiana Constitution of 1974. Specifically, the trial court found that prior to the impoundment of the vehicle, an owner must be given a hearing on whether or not he is in compliance with this state's compulsory motor vehicle liability insurance laws. Upon careful review of the jurisprudence and applicable law, we reverse, finding the motor vehicle owner's due process rights are adequately protected by the postdeprivation remedies provided under the Act. We also reject plaintiffs' arguments that notice to the owner of the impoundment is deficient and that the Act is unconstitutionally vague. We remand the case to the trial court for consideration of plaintiffs' remaining challenges to the constitutionality of this Act.

FACTS AND PROCEDURAL HISTORY
The Act
In 1997, the Louisiana Legislature adopted Act No. 1486 which amended and reenacted La. R.S. 32:863.1(C) and (D) and enacted La. R.S. 32:863.1(F), (G), and (H). This Act became effective January 1, 1998. Section 32:863.1 provides it is unlawful for an owner or lessee to operate or allow the operation of a motor vehicle unless that vehicle contains a certificate of insurance, a duplicate of a motor vehicle liability bond, a certificate of the state treasurer stating that cash or securities have been deposited with the treasurer, or a certificate of self-insurance. La. R.S. 32:863.1(A). When a law enforcement officer stops a vehicle either as part of an insurance checkpoint, in connection with an alleged violation of the law, or as part of an investigation of an accident, he "shall" determine if the vehicle is in compliance with provisions which require that evidence of liability insurance be contained in the vehicle. La. R.S. 32:862.1(B). Impoundment, penalties and fines are premised upon the inability of the operator to produce a "document." La. R.S. 32:863.1(C)(1)(a). Despite this explicit provision, the legislature, apparently in an effort to ameliorate the harshness of impounding a vehicle which was in fact insured at the time of the check but lacked the requisite documentary proof, provided in La. R.S. 32:863.1(G) that "proof of insurance" shall also include:
(3) The records of the Department of Public Safety and Corrections, if such records reflect that the motor vehicle is covered by a valid and current policy of liability insurance.
(4) The law enforcement officer making the stop has a reasonable belief that the motor vehicle is covered by a valid and current policy of liability insurance.
La. R.S. 32:863.1(G).
If the vehicle is not in compliance with the law, it "shall" be impounded, and the operator "shall" be issued a notice of noncompliance. The notice of noncompliance shall serve as notice of the rights of the owner and shall contain the provisions of the statute. La. R.S. 32:863.1(C)(1)(a). Additionally, the officer "shall" remove the license plate from a Louisiana registered vehicle. However, when there is a passenger in the motor vehicle under the age of twelve, when the driver or a passenger is handicapped, or when the officer perceives there would be a threat to the public safety or the safety of the occupants of the vehicle, the law enforcement officer "may" choose to issue a temporary sticker rather than impound the vehicle. La. R.S. 32:863.1(C)(7). In cases where the vehicle is not impounded even though it is in violation of the law, the license plate shall be forwarded with the notice of noncompliance to the office of motor vehicles, and a sticker shall be affixed to the rear of the vehicle which constitutes a "temporary" license good for three days thereafter. La. R.S. 32:863.1(C)(1)(a) and (2).
*1248 The consequences of the impoundment which are triggered by the noncompliance vary depending on whether or not the vehicle was actually insured at the time of the violation. If the owner of the vehicle presents to the office of motor vehicles within three days from the date of the violation proof of insurance coverage or security in effect at the time of the violation, the license plate shall be returned within 48 hours to the vehicle owner "at no cost to the owner." La. R.S. 32:863.1(C)(1)(b). The owner still has to pay the towing and storage fees, however. The owner may then recover his motor vehicle. However, if the owner does not have such proof or does not present it within three days, the license plate will be destroyed, the secretary of the office of motor vehicles will be notified of the noncompliance, and the secretary "shall" revoke the registration of the vehicle. La. R.S. 32:863.1(C)(1)(b). If the owner presents proof of insurance in effect at the time of the violation after the three days, the owner shall be required to pay only the storage and wrecker fees and a $10.00 administration fee prior to the reinstatement of registration and license plate privileges and the recovery of his motor vehicle. La. R.S. 32:863.1(C)(5)(a) and (D). If the owner presents proof only of subsequently acquired insurance after the three days, reinstatement of the registration and license plate can be obtained provided certain substantial reinstatement fees and the towing and storage fees are paid. La. R.S. 32:863.1(C)(1)(c) and (D).
At all times, the owner may request an administrative hearing limited to a review of the issue of whether the vehicle was covered by insurance at the time of the alleged violation; however, such a request will not stay the sanctions required by the statute. La. R.S. 32:863.1(C)(5)(a). The owner may obtain judicial review of the decision of the administrative hearing officer. La. R.S. 32:863.1(C)(5)(b).

The Lawsuit
On January 13, 1998, State Senator Cleo Fields filed suit against the State of Louisiana, Through the Department of Public Safety and Corrections (DPSC) and Richard L. Stalder, Secretary of Louisiana Department of Public Safety and Corrections, seeking a judgment declaring portions of Act 1486 of the 1997 Regular Session unconstitutional. First and Second Supplemental Petitions added State Senator Lynn B. Dean and citizens Toriano Lamonte Jordan and Ebony Denile Martin as plaintiffs.[1] The plaintiffs requested the issuance of a temporary restraining order, a preliminary injunction, and a permanent injunction prohibiting the enforcement of the Act.
The original and supplemental petitions reveal plaintiffs challenged the constitutionality of the Act on several different constitutional grounds. First, plaintiffs alleged the Act abridged a person's due process rights under the Fourteenth Amendment and La. Const. Art. I, § 2 for four reasons. They argued: (1) it allowed for the seizure and impoundment of a privately owned motor vehicle without any predeprivation hearing before a neutral and detached decision maker; (2) it did not require the notice of noncompliance be given to the owner of the motor vehicle; (3) it was impermissibly vague and indefinite because it gave the law enforcement officer the unfettered discretion to decline enforcement of the provision if he had a "reasonable belief the motor vehicle was covered by insurance; and (4) it required the DPSC to promulgate rules and regulations necessary to implement the Act's provisions prior to its enforcement, but no rules had yet been promulgated. Second, plaintiffs alleged the Act violated La. Const. Art. II, § 2 providing for the separation of powers because it allowed the law enforcement officer to be arresting officer, judge and jury. Third, plaintiffs alleged the Act violated the Equal Protection Clauses of the Louisiana and United States Constitutions because "unfettered discretion" given to the officer had the potential to be administered in a discriminatory fashion. Fourth, plaintiffs alleged the Act violated the right to privacy under La. Const. Art. I, § 5. Fifth, plaintiffs *1249 argued the Act deprives persons of their constitutional right to access to the courts found in La. Const. Art. I, § 22. Sixth, plaintiffs argued the Act allowed for a "taking" by the government in violation of one's right to property found in La. Const. Art. I, § 4. Finally, plaintiffs alleged the Act allowed for the forfeiture of property without the right of judicial review found in La. Const. Art. I, § 19 and constituted cruel and unusual punishment in violation of both La. Const. Art. I, § 20 and the Eighth Amendment.
On January 16, 1998, the trial court issued a temporary restraining order restraining the State through the Department of Public Safety and Corrections from impounding any motor vehicles under La. R.S. 32:863.1 pending the trial on the petition. Louisiana Commissioner of Insurance, James H. "Jim" Brown sought, and was granted, permission to intervene in this action. After a brief trial on the merits and a later hearing seeking to clarify the judgment, the trial court issued a judgment which declared:
IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the following phrase in Paragraph (C)(1)(a) is declared unconstitutional: "... the motor vehicle shall be impounded and ..."
IT IS FURTHER ORDERED ADJUDGED AND DECREED that the following phrase in paragraph (C)(5) is declared unconstitutional: "A request for a hearing shall not stay the sanctions required by this Part."
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Paragraph (C)(6) is declared unconstitutional.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the following phrase in Paragraph (H)(2) is declared unconstitutional: "The rules and regulations shall provide that the failure to display the decal in an approved location on the vehicle or the displaying of an expired decal may subject the vehicle to being towed and impounded, unless the driver can show that the vehicle is covered by a valid policy of insurance or is self-insured pursuant to this Chapter before towing the vehicle.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that declaration of the unconstitutionality of the above parts of Act 1486 of the 1997 Regular Session of the Louisiana Legislature shall in no way affect the enforceability of the remainder of the statute, since LSA-R.S. 24:175 makes all legislation severable in the event that one or more sections are declared unconstitutional.
Oral reasons both at the original trial and at the clarification of judgment hearing indicate the trial court declared these portions of the statute unconstitutional solely because they authorized the impoundment of the vehicle "prior to a hearing," and "without a hearing." "You have the right to a hearing before your property is seized," the trial court observed. Thus, it appears the trial court found portions of the Act unconstitutional on the ground they violated due process because they authorized impoundment of the vehicle without a predeprivation hearing. The trial court did not address any of the other due process arguments (notice, vagueness, failure to promulgate rules) or any of the other alleged grounds for unconstitutionality under other constitutional provisions.
From the above judgment declaring portions of a legislative act unconstitutional, defendant was given a direct appeal to this court. La. Const. Art. V, § 5(D). Because we believe the due process issues of vagueness and notice are inextricably intertwined with the sole issue ruled upon by the trial court concerning whether or not plaintiffs are entitled to a predeprivation hearing, and because these issues were sufficiently briefed to this court, we feel compelled to address them herein. However, the issue of whether or not plaintiffs have been deprived of due process because of the State's alleged failure to promulgate rules and regulations is not integral to our resolution of whether a predeprivation hearing is necessary. Furthermore, this issue was not addressed by the trial court nor was it sufficiently briefed or presented to this court for us to make a determination. Consequently, this case is remanded to the trial court for consideration of the due process argument related to the promulgation of rules and regulations as well *1250 as plaintiffs' remaining constitutional challenges, as these arguments were pretermitted by the trial court.

ANALYSIS
Under the Fourteenth Amendment to the United States Constitution and La. Const. Art. I, § 2 of the Louisiana Constitution of 1974, a person is protected against a deprivation of his life, liberty, or property without "due process of law." Unlike the Louisiana Constitution's provision on equal protection which is distinct from that provided in the Fourteenth Amendment, its guarantee of due process does not vary semantically from the Due Process Clause of the Fourteenth Amendment. Progressive Security Insurance Co. v. Foster, 97-2985, p. 12 (La.4/23/98), 711 So.2d 675, 688. Consequently, federal jurisprudence is relevant in determining the nature and extent of La. Const. Art. I, § 2's due process protection.[2]
The meaning of procedural due process is well-settled. Persons whose rights may be affected by state action are entitled to be heard at a meaningful time and in a meaningful manner, and in order that they may enjoy that right, they must first be notified. In re Adoption of B.G.S., 556 So.2d 545, 549 (La.1990). For due process to apply, the private interest which will be affected by state action must be constitutionally cognizable. Id. If it is, then it becomes necessary to evaluate what specific process is due under the particular circumstances presented.
The State does not challenge the proposition that a motor vehicle owner has a property interest in his vehicle which cannot be deprived, even temporarily, without due process of law. The issue presented here is what process is due when an officer impounds a motor vehicle immediately after determining the operation of the vehicle is in violation of the Compulsory Motor Vehicle Liability Security Law because it does not contain the required documents evidencing insurance coverage.
Very generally, due process requires some kind of hearing and notice thereof. In Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the United States Supreme Court set forth three factors to be weighed when determining the specific dictates required by due process: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. Mathews, 424 U.S. at 335, 96 S.Ct. at 903. Due process is flexible and calls for such procedural protections as the particular situation demands. Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). It is well established that "`due process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." Cafeteria & Restaurant Workers v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961).
With regard to the instant case, plaintiffs specifically object to the lack of a predeprivation hearing before a neutral decision maker prior to the impoundment of the vehicle and to the lack of notice to the owner, in cases where the operator is not also the owner, of the impounding itself and of the owner's rights. Plaintiffs additionally complain the Act violates due process because it is unconstitutionally vague.

*1251 Hearing
Generally, before a person is deprived of a protected interest, he must be afforded some kind of hearing. However, this court has often recognized there may be circumstances involving a valid governmental interest which justify postponing the hearing until after the event. In re Adoption of B.G.S., 556 So.2d 545, 553 (La.1990). A deprivation without opportunity for a prior hearing or other effective substitute safeguard has been allowed in "extraordinary" or "truly unusual" situations. Paillot v. Wooton, 559 So.2d 758, 762 (La.1990). "[E]mergency action may be proper pending a hearing when matters of public health and safety are involved." Id. See also Wilson v. City of New Orleans, 479 So.2d 891 (La.1985) and Bell v. Department of Health and Human Resources, 483 So.2d 945, 951 (La.), cert. denied, 479 U.S. 827, 107 S.Ct. 105, 93 L.Ed.2d 55 (1986) ("[W]e note that there seems to be an emerging concept that in some instances due process is fulfilled by a `post deprivation' hearing. We believe that this view to procedural due process in certain situations is sound and is in support of our decision here.").

Federal Jurisprudence
Numerous United States Supreme Court cases support and even broaden this view. The following quote briefly encapsulates the Court's most recent position on this issue:
This Court has recognized, on many occasions, that where a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process clause. (Citations omitted). Indeed, in Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), overruled in part on other grounds, Daniels v. Williams, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), we specifically noted that "we have rejected the proposition that [due process] always requires the State to provide a hearing prior to the initial deprivation of property." 451 U.S., at 540, 101 S.Ct., at 1915. And in FDIC v. Mallen, 486 U.S. 230, 108 S.Ct. 1780, 100 L.Ed.2d 265 (1988), where we unanimously approved the Federal Deposit Insurance Corporation's suspension, without prior hearing, of an indicted private bank employee, we said: "An important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation." Id., [ 486 U.S.]at 240, 108 S.Ct., at 1787-1788.
Gilbert v. Homar, 520 U.S. 924, 117 S.Ct. 1807, 1812, 138 L.Ed.2d 120 (1997)(emphasis added). See also Parratt v. Taylor, 451 U.S. 527, 539, 101 S.Ct., 1908, 1915, 68 L.Ed.2d 420 (1981), overruled in part on other grounds, Daniels v. Williams, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)("[Our] cases recognize that either the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, can satisfy the requirements of procedural due process.").
Significant in the Supreme Court's jurisprudence in this area is whether the State is seeking to finally and permanently or temporarily deprive a person of his property interests. In Parratt, supra, the Court made clear that although some of its prior cases seemed to imply a predeprivation hearing was always required, this was not necessarily the case where a temporary deprivation was involved.
Our past cases mandate that some kind of hearing is required at some time before a State finally deprives a person of his property interests. The fundamental requirement of due process is the opportunity to be heard and it is an "opportunity which must be granted at a meaningful time and in a meaningful manner." (Citation omitted). However, as many of the above cases recognize, we have rejected the proposition that "at a meaningful time and in a meaningful manner" always requires the State to provide a hearing prior to the initial deprivation of property. This *1252 rejection is based in part on the impracticability in some cases of providing any preseizure hearing under a state-authorized procedure, and the assumption that at some time a full and meaningful hearing will be available.
Parratt, 451 U.S. at 540-41, 101 S.Ct. at 1915-16 (emphasis added)(footnote omitted).
Under the foregoing principles and in a variety of circumstances, the Supreme Court has held that a meaningful and prompt postdeprivation hearing of some sort sufficiently protected the due process rights of a person whose property interests had been previously affected in some way. Thus, in Gilbert v. Homar, supra, the Court found that due process did not entitle plaintiff to a predeprivation hearing where he was temporarily and immediately suspended (as opposed to terminated) without pay upon his arrest for a drug felony.[3] Similarly, in Federal Deposit Ins. Corp. v. Mallen, 486 U.S. 230, 108 S.Ct. 1780, 100 L.Ed.2d 265 (1988), the Court noted that due process did not entitle an indicted bank official to a predeprivation hearing prior to his summary suspension by the FDIC in light of the FDIC's interest in protecting depositors and maintaining public confidence in our banking institutions. See also Barry v. Barchi, 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979) where the Court held that the State's interest in preserving the integrity of the sport of horse racing and in protecting the public from harm justified a horse trainer's immediate suspension where his horse tested positive for drugs after a race.
Perhaps most relevant for our purposes, insofar as a person's ability to operate a vehicle was restricted, the Supreme Court has held a person's driver's license can be immediately suspended without a predeprivation hearing under certain circumstances. In Mackey v. Montrym, 443 U.S. 1, 99 S.Ct. 2612, 61 L.Ed.2d 321 (1979) and Dixon v. Love, 431 U.S. 105, 97 S.Ct. 1723, 52 L.Ed.2d 172 (1977), the Court was called upon to decide whether statutes which allowed the immediate suspension of a person's driver's license under certain clearly enunciated circumstances violated due process because they did not provide for a pre-suspension hearing. In both cases, the Court held that the States' interests in public safety combined with the de minimis risk of an erroneous deprivation justified immediate government action suspending a person's driver's license where followed by a postdeprivation opportunity to be heard.
Unlike the United States Supreme Court, the federal appellate courts have specifically addressed the issue of whether a predeprivation hearing is required where an individual's motor vehicle is towed and impounded. The circuits which have addressed the issue uniformly hold that where vehicles are illegally parked or not properly registered, a predeprivation hearing is not required to satisfy due process where there is provided some type of prompt post-impoundment hearing. DeFranks v. Mayor and City Council of Ocean City, 777 F.2d 185 (4th Cir.1985) (Predeprivation hearing not required prior to towing and impounding a vehicle which did not display a required parking permit regardless of whether the owner in fact had such a permit.); Breath v. Cronvich, 729 F.2d 1006, 1010 (5th Cir.), cert. denied, 469 U.S. 934, 105 S.Ct. 332, 83 L.Ed.2d 268 (1984) ("[I]t is clear that prior notice and hearing is not required to tow illegally parked cars.");Sutton v. City of Milwaukee, 672 F.2d 644, 646 (7th Cir.1982) (Even where the illegally parked vehicle does not present an emergency situation, "it is not a violation of the due process clause to tow an illegally parked car without first giving the owner notice and an opportunity to be heard with respect to the lawfulness of the tow."); Allen v. City of Kinloch, 763 F.2d 335, 336 (8th Cir.1985) ("It appears settled that municipalities authorizing towing of illegally parked cars are not required by the Constitution to establish pre-deprivation notice and hearing procedures."); Scofield v. City of Hillsborough, *1253 862 F.2d 759 (9th Cir.1988) (Due process does not require that a pre-towing notice or hearing be given to the owner of an unregistered vehicle before the vehicle can be towed.); Suffer v. City of Costa Mesa, 798 F.2d 361, 363 (9th Cir.1986) ("[W]e agree there is no right to a pre-tow hearing."); Cokinos v. District of Columbia, 728 F.2d 502 (D.C.Cir.1983) (There is no due process right to pre-towing notice and hearing even where an illegally parked vehicle does not present an emergency situation.). Although the case before us does not deal with the towing and impoundment of an illegally parked or unregistered vehicle but of a vehicle which does not contain the required proof of insurance, we find this distinction insignificant because in all three instances the owner or operator is using a motor vehicle in a manner deemed illegal by the State.
Of course, once a vehicle is towed or impounded, some form of fair and impartial hearing at which an owner is given an opportunity to challenge the lawfulness of the removal of his vehicle and of the assessment of charges against him must be provided within a reasonable time period. Breath, supra, 729 F.2d at 1011. Under the instant Act, the owner may recover his vehicle the very next day after impoundment upon presentation of proof of insurance coverage at the time of the violation or even proof of newly acquired insurance provided he pays the towing and storage fees in either case. The owner has ten days from the issuance of the notice of noncompliance at the time of the impoundment to request an administrative hearing limited to the review of whether the vehicle was covered by insurance at the time of the violation. La. R.S. 32:863.1(C)(5)(a); Office of Motor Vehicle Policy, Section 3, Policy 2.0. There is no indication in the record or the law of when the administrative hearing must take place once it is requested by the vehicle owner.

Private Interests Affected
We turn now to the application of the Eldridge factors to the instant case in light of the above jurisprudence on pre- and post-deprivation hearings. The first step in the balancing process mandated by Eldridge is identification of the nature and weight of the private interest affected by the official action challenged. The private interest affected here is the owner's interest in his motor vehicle. More particularly, it is his interest in continued possession and use of his motor vehicle pending the outcome of the hearing due him. Even a temporary, nonfinal deprivation of property is nonetheless a "deprivation" within the contemplation of the Fourteenth Amendment and entitled to due process protection. Paillot v. Wooton, 559 So.2d 758, 760 (La.1990). Furthermore, as we recognized in Wilson v. City of New Orleans, 479 So.2d 891 (La.1985), a vehicle is not only a necessity of modern day life, but deprivation of a person's mode of transportation, even for short periods, can significantly affect that person's livelihood.
On the other hand, the State is not seeking to actually take ownership of the vehicle but only to temporarily suspend its use pending presentation of proof of insurance. Although the deprivation is significant, it is only temporary, and the Supreme Court has recognized that in determining what process is due, account must be taken of "the length" and "finality" of the deprivation. Gilbert, supra, 117 S.Ct. at 1813. See also Mackey v. Montrym, 443 U.S. 1, 12, 99 S.Ct. 2612, 2618, 61 L.Ed.2d 321 (1979) ("The duration of any potentially wrongful deprivation of a property interest is an important factor in assessing the impact of official action on the private interest involved."). So long as the motor vehicle owner receives a sufficiently prompt postdeprivation hearing or opportunity to be heard, the financial loss incurred because of the temporary impoundment of the vehicle is relatively insubstantial when compared to the types of deprivations which the Supreme Court has held require predeprivation hearings such as termination of employment, Loudermill, or civil forfeiture of a home, U.S. v. James Daniel Good Real Property, 510 U.S. 43, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993).
Additionally, although our constitution grants to persons the "right to acquire, own, control, use, enjoy, protect, and dispose of private property," this right "is subject to reasonable statutory restrictions and the reasonable exercise of the police power." La. *1254 Const. Art. I, § 4. As such, it is "firmly established" that the right to operate a motor vehicle in Louisiana is a "privilege" granted by the State and not a constitutional right, Progressive Security Ins. Co. v. Foster, 97-2985, p. 4 (La.4/23/98), 711 So.2d 675, 682. Consequently, the State has and can enact numerous conditions on that privilege, one of which is the requirement that motor vehicles be insured and that documentary proof of such insurance be contained at all times in the vehicle.
We recognize the owner also has a financial interest in the personal inconvenience and economic hardship he will suffer as a result of the impoundment as well as the towing and storage fees he will have to pay, regardless of whether he, in fact, has motor vehicle liability insurance. However, the law at issue here premises impoundment on the requirement that a motor vehicle contain certain documentary proof of insurance, not on the fact of whether or not that vehicle is actually insured. The legislature has chosen to make it a violation of Louisiana law for a motor vehicle to fail to contain certain documentary proof of insurance.

Risk of Error
Having determined the nature of the private interests involved, we turn now to the risk of error inherent in the chosen procedure. Because a primary function of the legal process is to minimize the risk of erroneous decisions, the second stage of the Eldridge inquiry requires consideration of the likelihood of an erroneous deprivation of the private interest involved as a consequence of the procedures used. Mackey v. Montrym, 443 U.S. 1, 13, 99 S.Ct. 2612, 2618, 61 L.Ed.2d 321 (1979). There is virtually overwhelming assurance the deprivation in these cases is not baseless or unwarranted. The statute authorizes impoundment of the motor vehicle when it does not contain the requisite documentary proof of insurance. The occupant of the motor vehicle either will or will not be able to produce this proof. An officer will easily and readily be able to determine whether the operator has produced such proof. A predeprivation hearing on the issue of whether or not the vehicle contains this proof would be redundant and serve no additional purpose for it would be the rare occasion where the vehicle's owner would be able to convince an impartial arbiter that he really did show proof of insurance to the officer. See, e.g., Sutton v. City of Milwaukee, 672 F.2d 644, 646 (7th Cir.1982) (observing that a pre-towing hearing was not necessary in cases involving illegal parking because a determination that a vehicle was illegally parked was "pretty cut and dried.").
Plaintiffs err by concluding the risk of erroneous deprivation is great because motor vehicles which are actually insured will be impounded if they do not contain the statutorily required documentary proof. In fact, plaintiffs averred during argument these people "are in compliance" with the Compulsory Motor Vehicle Safety Responsibility Law and are being unfairly punished. However, this argument ignores the statutory scheme. Louisiana R.S. 32:863.1(A) requires owners or lessees of motor vehicles to keep certain documentation evidencing the vehicle is insured within the vehicle if it is to be operated on a public road. Sections 32:863.1(B) & (C)(1)(a) require an officer to impound the vehicle if it is not in compliance with the provision requiring evidence of liability insurance be contained in the vehicle. Thus, owners whose vehicles do not contain the documentary proof are not in compliance with the Motor Vehicle Safety Responsibility Law, and the legislature, in its wisdom, has seen fit to require that these motor vehicles be immediately impounded until such proof can be presented. The owner is being temporarily deprived of the use of his motor vehicle because it does not contain the statutorily required documentary proof are not because it may or may not ultimately, in fact, be shown to have been insured at the time of the inquiry by the officer. Whether the motor vehicle is in fact insured at the time of the issuance of noncompliance does not render the officer's conclusion erroneous because it is the lack of documentary proof which triggers the impoundment procedure.
Although the legislature has determined the consequences of the owner's inability to produce this proof are lessened where there was in fact insurance on the motor vehicle at the time it was impounded, *1255 this does not change the fact that the violation which triggers impoundment is the lack of documentary proof. Here, the impoundment is supported by the officer's objective finding that the vehicle does not contain the required proof of insurance. Furthermore, to the extent that the officer's determination may possibly be erroneous in that the vehicle actually contained documentary proof, the Due Process Clause has never been construed to require that the procedures used to guard against an erroneous deprivation of a protectible "property" interest be so comprehensive as to preclude any possibility of error. "The Due Process clause simply does not mandate that all governmental decisionmaking comply with standards that assure perfect, error-free determinations." Mackey, 443 U.S. at 13, 99 S.Ct. at 2618. Additionally, the owner may always obtain his vehicle immediately upon proof of insurance, request a hearing, prove he did show proof to the officer, and obtain a refund of all fees because the tow would have been illegal.
This case is very similar to Mackey v. Montrym, supra. Under Massachusetts law, a person who refuses to submit to a breath analysis test upon his arrest for operating a motor vehicle while under the influence shall have his license suspended based solely on the officer's report indicating the fact of the arrest, the grounds supporting the arrest, and the fact of the driver's refusal to take the breath analysis test. It is not necessary for the driver to be convicted of D.W.I. nor is it necessary that the driver in fact was operating the vehicle while under the influence for his license to be immediately suspended. The suspension is effective immediately, with the driver being given the opportunity to appeal the suspension or to request an immediate post-suspension hearing. The Supreme Court held the driver was not entitled to a pre-suspension hearing. Although it noted the driver had a substantial property interest in the license which allowed him to operate a motor vehicle, there was little risk of an erroneous deprivation, and additional procedures would serve no purpose, especially in light of the strong state interest in the suspension. Specifically, the Court noted that the predicates for the driver's suspension were the objective facts of probable cause justifying the arrest and the driver's refusal to take the test. It was not relevant, for purposes of the Massachusetts statute, whether the driver was, in fact, operating the vehicle while under the influenceonly that he had been arrested based on probable cause for doing so. In such a case, the Registrar of Motor Vehicles was required to suspend the license. The risk of an erroneous observation or deliberate misrepresentation of the facts by the reporting officer was found "insubstantial" and a hearing prior to the suspension by the Registrar would be "an exercise in futility" because the Massachusetts Legislature had already made the determination that the Registrar lacked discretion as to whether or not to suspend the license.
Another case involving a similar analysis is Gilbert, supra. Therein, the Supreme Court upheld the temporary suspension without a predeprivation hearing of a state employee who had been arrested on felony charges. A presuspension hearing was not necessary because its only purpose would be to assure that there were reasonable grounds to support the suspension without pay, and this had already been assured by the arrest and the filing of charges. Similarly, in Federal Deposit Ins. Corp. v. Mallen, supra, the U.S. Supreme Court held a pre-deprivation hearing was not required where a bank official's employment was immediately suspended upon indictment. Likewise, in Barry v. Barchi, supra, the Court held a pre-deprivation hearing was not required where a horse trainer was immediately suspended upon his horse's positive test for drugs. Although it could ultimately be shown at a hearing that the indictment was not warranted or that the drug test was false, the states' interests justifying immediate suspension were paramount where there was an opportunity for a postdeprivation hearing and where there was some assurance, in the form of the indictment and the positive drug test, that the deprivation was not baseless or unwarranted.
In the instant case, we are dealing only with the temporary impoundment of a motor vehicle because it did not contain the statutorily required documentary proof of insurance. It is irrelevant at that point whether *1256 the vehicle is actually insured, for the legislature has mandated that all vehicles carry proof of insurance. The risk of an erroneous observation or deliberate misrepresentation of the facts surrounding whether the operator, in fact, presented such proof, is insubstantial.[4] A hearing prior to the impoundment would be an "exercise in futility" because the hearing's only purpose would be to determine whether or not the officer was correct in determining the vehicle, indeed, lacked such proof. The owner is given the opportunity to limit the negative consequences of the noncompliance by presenting proof of insurance within three days. Otherwise, the impoundment will continue until such proof is presented, and the owner has the right to request an administrative hearing under La. R.S. 32:863.1(C)(5)(a).
We note that because the owner is able to recover his vehicle with proof of insurance the very next day after the impoundment, thereby limiting the storage fees he incurs as well as the length of time he is deprived of his vehicle, there is no additional harm to him resulting from the fact that the administrative hearing will not be held until some indefinite time in the immediate future.[5] If the owner shows at the hearing that his vehicle was in fact insured at the time of the issuance of the notice of noncompliance and that this proof was in fact presented to the officer, then the owner can be made whole after the hearing with a refund of the towing, storage, and administrative fees since the tow would have been illegal. If the owner shows at the hearing that his vehicle was in fact insured at the time of the issuance of the notice of noncompliance even though this proof was not presented to the officer, then the owner, who was able to obtain his vehicle the very next day after the impoundment, was still properly held accountable for the towing and storage fees because the tow was justified by the vehicle's failure to contain such proof. Finally, an administrative hearing, whether delayed or not, is of no benefit to an owner whose vehicle remains uninsured, and thus impounded, because the State is allowed, as explained earlier, to make it illegal for vehicles to be operated without insurance. Under any of these factual situations, the effect of the delay between the impoundment of the vehicle and the administrative hearing is minute.

Governmental Interests
The third factor of the Eldridge balancing test requires us to identify the governmental function involved and the state interests served by the summary procedures. The State's interests are immediately apparent in Louisiana's requirement that a motor vehicle be impounded where it does not contain the required documentary proof of insurance. To begin with, Section 1 of Act 1746, which included, inter alia, the instant impoundment provisions, stated it was enacted out of a concern for: (1) the lack of compliance with the Motor Vehicle Safety Responsibility Law; (2) the high incidence of motor vehicle accident claims in the State's courts; (3) the reduction of the high cost of motor vehicle insurance through reformation of the civil justice system; (4) the evident imbalance in the State's motor vehicle insurance system *1257 which had engendered abuse within the system; and, (5) the need for insurance cost savings to the citizens of the State through a reduction of premium rates for motor vehicle insurance. Progressive Security Ins. Co., supra, 97-2985 at p. 9, 711 So.2d at 687.
Requiring that proof of insurance be contained within the motor vehicle provides the easiest, quickest, most efficient, and least subjective method for an officer to determine whether or not a motor vehicle complies with the compulsory insurance requirements. Providing that a motor vehicle lacking such proof will be immediately and temporarily impounded pending the presentation of such proof to the office of motor vehicles will primarily serve as a deterrent to those who consider not insuring their automobiles. This in turn serves to increase the number of insured automobiles, reduces the need for uninsured motorist coverage, and, thereby reduces premiums for all citizens of the state. The immediate impoundment will also serve to quickly remove from the roads a vehicle which the legislature, given its documentary proof requirement, is entirely justified in assuming lacks motor vehicle insurance. This summary action will necessarily reduce the number of accidents involving uninsured automobiles, reduce insurance company costs, and in turn, reduce premiums.
A pre-suspension hearing on the issue of whether or not the motor vehicle is, in fact, insured, will fail to accomplish either of these purposes as effectively. First, there is virtually no way the city or state can conduct a pre-towing hearing at the time and place where the officer has discovered the vehicle does not contain proof of insurance. The cost of doing so would be clearly prohibitive and would ultimately require the abandonment of towing and impoundment as a method of dealing with uninsured motorists. See, e.g., Sutton v. City of Milwaukee, 672 F.2d 644, 646 (7th Cir.1982). As a result, in order to provide a pre-towing hearing at some subsequent time, the State would be required to allow these presumably uninsured vehicles to remain free, pending the predeprivation hearing, to traverse the public roads. This would increase the likelihood of an automobile accident involving an uninsured motorist with its concomitant increase in premiums. Furthermore, and perhaps most significantly, the incentive to obtain insurance and to keep proof of insurance in the automobile, will be lessened absent the threat of immediate impoundment.
This case is readily distinguishable from Wilson v. City of New Orleans, 479 So.2d 891 (La.1985) relied on by plaintiffs as controlling our decision herein. That case dealt with alleged due process violations in a scofflaw immobilization program administered by a private corporation. The corporation collected unpaid parking ticket fines on vehicles with three or more unpaid parking violations through the use of a "boot" which immobilized the vehicle. This court, balancing the Eldridge factors, required that there be notification of the proposed boot order and a brief period for informal discussion prior to the issuance of the immobilization order. The court focused on the risk of error by human or computer as to whether or not there were at least three outstanding parking tickets, the lack of a neutral decision maker (the private corporation received a portion of all fines collected, and the immobilization program was the "heart" of its enforcement program), and the weak state interest in immediately immobilizing vehicles which are legally parked in order to mandate compliance with past violations.
[T]he routine daily booting of automobiles as part of a municipal parking enforcement system does not present a "truly unusual" situation justifying outright seizure without opportunity for notice and at least an informal hearing prior to final issuance of the order to boot. Seizure before notice of a pending proceeding to boot and an opportunity to object informally is not necessary to secure any governmental or public interest involved in the booting operation. There is no need for action so prompt following the initial proposal to boot as to preclude effective notice and a chance to be heard at least informally.

Wilson, 479 So.2d at 902-03.
In the instant case, the motor vehicle is not in compliance with the law at the time it is impounded. Preventing a presumably uninsured vehicle from remaining on the *1258 public roads is significantly more important than preventing a vehicle with past due parking fines from continuing to operate. The police officer, and later, the office of motor vehicles, are disinterested decision makers who have no financial stake in impounding or prolonging the impoundment of the motor vehicle. While the immediate booting of a vehicle legally parked for failure of its owner to pay prior parking tickets is not necessary in order to effectuate a city's routine parking program, the immediate impoundment of a motor vehicle is justified in this case. The motor vehicle is not in compliance with the law requiring documentary proof of insurance. This gives rise to the reasonable assumption that not impounding the motor vehicle would increase the likelihood of an accident involving an uninsured vehiclea severe particular detriment to anyone involved in such an accident, especially those who are insured but lack uninsured motorist coverage, and a general detriment to all Louisiana citizens who bear the loss through increased premiums. The threat of immediate impoundment serves as a significant deterrent to those who would consider operating a motor vehicle without automobile insurance which deterrent would not exist without the threat of immediate impoundment. Also, there is virtually no risk of error inherent in the officer's determination that the vehicle is not in compliance with the law requiring documentary proof of insurance.
In sum, the State's interests in removing uninsured motor vehicles from the road and in deterring persons from operating a motor vehicle without insurance are significant. These interests justify the immediate deprivation of an owner's use of his motor vehicle where that deprivation is only temporary, where the owner may present proof of insurance and obtain his vehicle the very next day, where the risk of error as to whether the owner had such proof in his motor vehicle is minute, where the officer and the office of motor vehicles are neutral and detached and without financial incentive in the impoundment, and where the owner may request a postdeprivation administrative hearing if he is dissatisfied with the process.

Notice
Under the Act, the operator of the motor vehicle to be impounded is issued a notice of noncompliance listing his rights under the statute. Nowhere does the Act require any other notice to the owner of the motor vehicle although it is the owner who has three days from the issuance of the notice of noncompliance to present proof of insurance coverage and it is the owner who is liable for the various fees and penalties. Once the motor vehicle is towed and impounded, however, other statutes do provide for notice to the owner. La. R.S. 32:1720 of the Louisiana Towing and Storage Act provides that "[w]ithin seven days of the time that a vehicle is placed in a storage facility, the operator of the storage facility shall notify in writing, by certified letter, return receipt requested, the last registered owner of the vehicle at the owner's last known address and the mortgage holder, should there be any."[6] Additionally, R.S. 32:1718 requires that the storage facility notify the office of the sheriff or the municipal police from whose jurisdiction a vehicle has been towed so that the sheriff or police can "respond[] to requests from the public." La. R.S. 32:1718(B).
An elementary and fundamental requirement of due process is notice reasonably calculated under all the circumstances to apprise interested parties of the pendency of the action and to afford them an opportunity to present their objections. Memphis Light, Gas & Water Division v. Craft, 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978). Plaintiffs do not object to a lack of notice that their vehicles could be impounded absent proof of insurance or of their rights upon impoundment, nor could they. The Act itself *1259 gives all Louisiana citizens sufficient notice that impoundment will occur if the motor vehicle does not contain proof of insurance as well as notice of their rights and opportunity to be heard should their motor vehicles be impounded. The notice of noncompliance also lists the owner's rights. Plaintiffs allege instead the instant provisions violate procedural due process because the owner is given no notice of the actual impoundment of his vehicle in those circumstances where the operator is a different person from the owner. Thus, plaintiffs allege it is possible for an owner without notice that his vehicle has been impounded to accrue additional storage fees and to miss the three day deadline for presentation of proof of insurance such that he will not be able to prevent the revocation of his registration and the destruction of the license plate. A careful review of the workings of the Act and consideration of related statutes convince us the notice is reasonably calculated under all circumstances to apprise the owners their vehicles have been impounded and sufficient for purposes of due process.
It is reasonable to assume that in the majority of cases, the operator who receives the notice of noncompliance is also the owner. In such cases, the owner receives notice of the impoundment and of his rights under the statute immediately. As early as the next day, he can present proof of motor vehicle insurance to the office of motor vehicles and obtain the release of his vehicle. Under these circumstances, there can be no claim notice of the impoundment itself is deficient.
In the vast majority of the remaining cases, it is also reasonable to assume the owner explicitly or implicitly gave permission or authority to the operator to use the motor vehicle. In such a case, we find the operator is by operation of law the owner's representative for service of the notice of noncompliance and notice of the impoundment itself. Here, La. R.S. 32:863.1.(C)(1)(a) provides that the issuance of the notice of noncompliance to the operator "shall serve as notice of [the owner's] administrative hearings rights." By virtue of the publication of the Act, the owner knows that when he authorizes an operator, either explicitly or implicitly, to use the motor vehicle, La. R.S. 32:863.1 mandates that the vehicle contain documentary proof of insurance, that the vehicle be impounded for its failure to contain this proof, that the notice of noncompliance will be issued to the operator, and that this serves as notice to the owner.
This conclusion is supported and, indeed, compelled by La. C.C.P. art. 1235. That article provides "[s]ervice is made on a person who is represented by another by ... operation of law ... through personal ... service on such representative." By operation of law, La. R.S. 32:863.1(C)(1)(a) makes the operator the owner's representative for service of the notice of noncompliance. By virtue of the promulgation of this Act and La. C.C.P. art. 1235 of which the owner cannot disavow awareness, the owner, whenever he authorizes the use of his vehicle by another, has agreed to make the operator his representative for purposes of service of this notice. These same legislative enactments put an operator on notice that he, as the sole receiver of notice of the impoundment, has a duty as representative to convey this notice to the owner. The instant Act mandating notice only to the operator was published, and "no one can allege ignorance of the law." La. C.C. art. 7. Persons owning property within a state are charged with knowledge of relevant statutory provisions affecting the control or disposition of that property. Texaco, Inc. v. Short, 454 U.S. 516, 532, 102 S.Ct. 781, 793, 70 L.Ed.2d 738 (1982). To afford notice, a legislature "need do nothing more than enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply." Id. 454 U.S. at 532, 102 S.Ct. at 793. Additionally, we believe it reasonable to assume that in the vast majority of cases involving authorized operators, the operators will in fact convey the notice to the owners. In these circumstances, notice to the operator, where the operator is implicitly or explicitly authorized by the owner to use the vehicle, is reasonably calculated to notify the owner of the impoundment of his vehicle.
We acknowledge the potential for the rare situation where an unauthorized or authorized *1260 operator fails to promptly inform the owner of the impoundment of the vehicle. However, as explained earlier, procedural due process is not required to work perfectly in every situation. In such a case, the owner may have a civil remedy against the operator for the damages he incurs from his lack of knowledge of the whereabouts of his motor vehicle. Additionally, it is logical to assume that a person whose motor vehicle has disappeared will call the authorities. Because La. R.S. 32:1718 requires that the storage facility inform the authorities within twenty-four hours of the towing and storage, the owner will be informed by the authorities of the tow at that point.[7] Finally, the owner will in fact ultimately receive notice of the towing and impoundment. Under La. R.S. 32:1720, the storage facility must notify the registered owner by certified mail of the impoundment within seven days. In such a case, he then may present proof of insurance at the time of the violation and obtain his vehicle and the reinstatement of his license plate and registration by paying a $10.00 administrative fee and the towing and storage fees.
Applying the Eldridge factors to this particular issue of notice, we conclude the procedure for giving notice to be constitutionally acceptable in this case. First, regarding the private interests affected, we immediately observe that the owner's interest in his motor vehicle is only temporarily infringed as opposed to being completely abolished or taken, and in all but the rare case, the owner will receive prompt notice that his vehicle has been impounded either directly from the officer or soon thereafter from the operator of the vehicle. Even in the unusual case involving an uncooperative or even unauthorized operator who fails to inform the owner of the tow, the owner will be informed of it within twenty-four hours by the authorities if he reports his vehicle missing or stolen and will receive a notice by certified mail from the storage facility within approximately seven days. He may also have a cause of action against the operator who failed to inform him of the impoundment. On the issue of the risk of error, the possibility that an owner will not receive notice within the three day period is minimal as it is reasonable to assume the vast majority of impounded vehicles will be operated by the owners themselves or by operators who will inform the owner of the impoundment. Furthermore, any error can be cured because in all cases, the owner can request an administrative hearing, and, if he proves the motor vehicle was insured at the time of the impoundment, his license and registration will be reinstated and his vehicle returned to him for a $10.00 fee plus towing and storage fees.[8] Finally, with respect to the governmental interests involved, although it does not appear it would be any great financial or administrative burden for the office of motor vehicles to mail a notice of noncompliance to the registered owner the day following the impoundment, we simply do not believe this action is necessary for this scheme to comport with due process given: (1) the improbability that an impounded motor vehicle would be driven by a non-owner who fails to inform the owner of the impoundment, (2) the temporary nature of the deprivation, (3) the ability of the owner to bring a civil action against an operator who fails to inform him of the tow, (4) the ability of the owner to discover the whereabouts of his vehicle within twenty-four hours simply by calling the authorities when he mistakenly believes his vehicle lost or stolen, (5) the seven-day notice required to be mailed to the registered owner by the storage facility, (6) the owner's ability to have his license and registration reinstated *1261 without having to pay the substantial reinstatement fees, and (7) the always available option of requesting an administrative hearing.

Vagueness
Plaintiffs additionally alleged below the Act violates due process because it allows an officer to decline enforcement of the provision upon a "reasonable belief" the motor vehicle is covered by insurance, the parameters of which are undefined by the Act and therefore unknowable by the public. The constitutional requirement of definiteness in a statute derives from the due process clauses of the Louisiana and United States Constitutions. A penal statute must give adequate notice to individuals that certain contemplated conduct is proscribed and punishable by law and must provide adequate standards for those charged with determining the guilt or innocence of an accused. State v. Union Tank Car Co., 439 So.2d 377, 384 (La.1983). Adequate notice consists of language which allows ordinary men and women of reasonable intelligence to understand and obey the law, and to conform their conduct thereto. Id. The constitutional requirement of definiteness is satisfied when the language of a penal enactment "has a generally accepted meaning such that a person of ordinary intelligence would be given fair notice of what conduct is forbidden." Id. at 385. The requirement of adequate standards for ascertaining guilt mandates that a statute mark boundaries which are sufficiently distinct for judges and juries to administer the law in accordance with the legislative will. Id. at 385.
We need not address whether the Act is penal in nature for even assuming the instant Act is penal and not civil in nature, it satisfies the above criteria. The instant Act makes it very clear the conduct which is proscribed is operating or authorizing the operation of a motor vehicle which does not contain within it certain documents evidencing the vehicle is covered by insurance. It defines acceptable proof as including not only certain documents but also where "the law enforcement officer making the stop has a reasonable belief that the motor vehicle is covered by a valid and current policy of liability insurance." An individual can certainly and easily conform his conduct to the requirement of proof in order to avoid impoundment. He is given fair notice of the conduct which is forbidden. Even assuming an individual may not know with particularity what constitutes a "reasonable belief" on behalf of the officer, he is informed in definite terms that he can escape any penalty if his vehicle contains the necessary documents. In other words, an individual can modify his behavior to conform to the Act and avoid any penalty whatsoever by insuring his vehicle contains a record of insurance. This is distinguishable from those cases where the crime itself is defined in terms of "reasonableness." See, e.g., the statute stricken as vague in State v. Dousay, 378 So.2d 414 (La.1979) which required that a person having authority over a sewage treatment plant "take all usual and all reasonable measures and precautions to secure and ensure the property operation" of the plant. In such a case, it was impossible for the individual to determine what conduct was required of him in order to avoid a criminal sanction.
Furthermore, we decline to strike as vague a provision which manifestly operates to the benefit of the citizens of this state. It ameliorates the harshness of this Act by allowing an officer, in those cases where the automobile does not contain the documentary proof, to decline to impound the vehicle when he reasonably believes the vehicle is covered by insurance. We can think of any number of circumstances where an officer may conclude a reasonable basis for such a belief exists. To require the legislature to attempt to provide an explicit enumeration of these facts or circumstances would necessarily result in the exclusion of some reasons which an officer may feel are sufficient and would unduly hamper the exercise of discretion left to the officerdiscretion which can only operate to benefit certain motor vehicle owners who would otherwise have their vehicles automatically impounded. In this vein, we note plaintiffs allege the Act is unconstitutional because the "reasonable belief" exception allows for an officer to unlawfully discriminate when deciding which vehicles may actually be insured. This allegation is in the nature *1262 of an equal protection challenge which we decline to address today, this subject having been pretermitted by the trial court. That an officer may unlawfully discriminate in enforcing a law is not cause for finding a due process violation, however. It would be a mistake to shape the specific dictates of due process by the "risk of error inherent in the truthfinding process" as applied to "rare exceptions" as opposed to "the generality of cases." Mackey, 443 U.S. at 14, 99 S.Ct. at 2619. See also Allen v. City of Kinloch, 763 F.2d 335, 336-37 (8th Cir.), cert. denied, 474 U.S. 946, 106 S.Ct. 313, 88 L.Ed.2d 289 (1985) wherein the Eighth Circuit noted that "where a random and unauthorized act by a state employee results in a tortious taking of private property, due process is satisfied if state tort law provides a meaningful post-deprivation remedy."

CONCLUSION
The judgment of the trial court is reversed. The case is remanded to the trial court for consideration of plaintiffs' remaining arguments previously pretermitted below. In order to avoid piecemeal litigation, the trial judge is instructed to rule on all constitutional claims before him at that time.
REVERSED AND REMANDED.
CALOGERO, C.J., dissents and assigns reasons.
JOHNSON, J., dissents and will assign reasons.
CALOGERO, Chief Justice, dissenting.
The majority concludes that the Act before us is constitutional, finding that (1) the vehicle owner's due process rights are adequately protected by post-deprivation remedies provided for in the Act, (2) the lack of notice of noncompliance to the owner under circumstances in which the operator and the owner are not one and the same does not render the Act constitutionally deficient, and (3) the Act is not unconstitutionally vague. While I agree that the post-deprivation remedies adequately protect an owner's due process rights where the owner has received a timely notice of noncompliance, I believe that the majority erred in its conclusions with regard to the latter two findings. Thus, for the reasons that follow, I respectfully dissent.
In my view, the Act fails to provide adequate protection to the owner of a vehicle that is impounded under the circumstances in which the operator of the vehicle is not also the owner. Under the Act, the owner of the vehicle has three days from the issuance of the notice of noncompliance to present proof of insurance coverage in order to avoid having the license plate destroyed and the registration of the vehicle revoked. Moreover, it is the ownerand not the operatorwho is solely responsible for the various fees and penalties arising from the impoundment. However, the notice of noncompliance is issued only to the operator of the vehicle, with no provision under the Act for such notice to be also issued to the owner of the vehicle, where the operator and owner are not one and the same.
The majority glosses over this defect by concluding that "in the majority of cases, the operator who receives the notice of noncompliance [will also be] the owner [of the vehicle]." Slip op. at 1259. The majority further speculates that "[i]n the vast majority of remaining cases, it is ... reasonable to assume the owner explicitly or implicitly gave permission or authority to the operator to use the motor vehicle [and that, i]n such a case, ... the operator is by operation of law the owner's representative for service of the notice of noncompliance and notice of the impoundment itself." Id. The majority then concedes that there is "the potential for the rare situation where an unauthorized or authorized operator [will fair] to promptly inform the owner of the impoundment of the vehicle," but concludes that this "rare potential" does not offend procedural due process. I disagree both with the majority's speculative and unsupported conclusions regarding the potential frequency in which an owner who is not also the operator might fail to receive timely notice of the impoundment and with the majority's conclusion that the potential for such failures does not violate the constitutional guarantees of procedural due process.
*1263 In my view, the lack of a notice requirement to the owner of the vehicle is a fatal defect to the constitutionality of the Act. The fact that other statutory provisions might provide notice to the owner that his vehicle has been impounded does not remedy the unconstitutionality of the Act's failure to so provide the required notice.
I also take issue with the majority's finding that the provision which grants the officer the unfettered discretion to determine which vehicles will be impounded does not render the Act unconstitutionally vague. Under LSA-RS 32:863.1(G)(4), even where the operator of the vehicle is unable to provide documentary proof of insurance, the law enforcement officer making the stop may elect not to impound the vehicle if he "has a reasonable belief that the motor vehicle is covered by a valid and current policy of liability of insurance." The statute fails to set forth any guidance for determining just what an operator must do or have in his possession to result in the investigating officer's having a reasonable belief that the vehicle is insured.
In State v. Muschkat, 706 So.2d 429, 432 (La.1998), this Court explained that "the most important aspect of the vagueness doctrine is the requirement that a legislature establish minimal guidelines to govern law enforcement." The Court went on to instruct as follows: "Where the legislature fails to provide such minimal guidelines, a criminal statute may permit a standardless sweep [that could] allow [] policemen, prosecutors, and juries to pursue their personal predilection." Id. This is the very danger that is present under the above-quoted statutory provision that grants the investigating officer the unfettered discretion to enforce the impoundment law against some operators who fail to provide the necessary documentary showing, while exempting others who fail to do the same. Thus, because the offending statute, in the instant case, fails to set forth minimal (or any) guidelines to govern the standard for determining whether an operator without documentary proof has nonetheless met the burden of proving that the vehicle is insured, I would find the Act as written to be unconstitutionally vague under the standards set forth in this Court's decision in Muschkat, supra.[1]
For the reasons given above, I dissent.
NOTES
[*] Marcus, J., not on panel, recused. See Rule IV, Part 2, Section 3.
[1] Jordan's and Martin's vehicles were impounded under the new Act because they did not contain the required proof of insurance even though they were, in fact, insured at the time of impoundment.
[2] The guarantee of due process has evolved into two distinct protections: substantive due process and procedural due process. With a substantive due process review, a court looks only at whether a particular legislative measure was a rational way to correct a problem. Hayden v. Louisiana Public Service Commission, 553 So.2d 435, 440 (La.1989). Specifically, for legislation involving economic and social welfare interests, as opposed to fundamental rights, the test of substantive due process is whether the regulation is rational in relation to the goal sought to be attained and is adopted in the interest of the community as a whole. Med. Exp. Ambulance Service, Inc. v. Evangeline Parish Police Jury, 96-0543, p. 7 (La. 11/25/96), 684 So.2d 359, 365; Toney v. Whitfield, 531 So.2d 445, 446-47 (La. 1988).
[3] Compare to Cleveland Board of Education v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) where the Court held that a public employee dismissible only for cause was entitled to a very limited hearing prior to his termination. Although Gilbert recognized the severity of depriving someone of his means of livelihood, the Court in Gilbert held account must be taken of "the length" and "finality" of the deprivation, and a temporary suspension without pay was not nearly as significant as the actual termination in Loudermill.
[4] As noted in in Mackey, an officer is personally subject to civil liability for an unlawful arrest and to criminal penalties for willful misrepresentation of the facts. Therefore, he has "every incentive" to truthfully and accurately ascertain and report the facts. 443 U.S. at 14, 99 S.Ct. at 2619.
[5] Federal appellate court jurisprudence takes note of whether or not an owner can reclaim his vehicle pending the administrative hearing in determining whether the delay before the hearing is excessive. In Breath, supra, 729 F.2d 1006 (5th Cir. 1984), plaintiffs had argued they were not afforded an adequately prompt post-towing hearing in violation of their right to due process. The Fifth Circuit, noting that the vehicle owner could redeem his vehicle pending a hearing on the merits by obtaining an appearance bond, held that this procedure adequately protected the vehicle owner's interest in the uninterrupted use of his automobile while still affording him a post-towing hearing. Compare with Coleman v. Watt, 40 F.3d 255, 260-61 (8th Cir. 1994) where the Eighth Circuit held that a seven day delay after the immediate impoundment of a vehicle for various violations including lack of proof of insurance was excessive where the owner had no opportunity to regain the use of his vehicle prior to the hearing. The Eighth Circuit specifically noted that an "eventual" or "less-than-prompt" hearing was sufficient under the jurisprudence of the federal courts of appeal provided "the owner is permitted to regain the use of the impounded vehicle in the interim." Id. at 261.
[6] The notice shall include the location and name of the storage facility, the vehicle identification number and license plate number, a description of the vehicle, the name of the person or agency that had the vehicle towed and placed in storage, the date of the placement in storage, the condition of the vehicle, the notice of the owner's right to an administrative hearing, the address to which the request for a hearing must be sent, and the date by which the request for a hearing must be mailed. La. R.S. 32:1720(B).
[7] This factor was extremely significant in the Fifth Circuit's opinion in Breath, supra, 729 F.2d at 1011. Therein, the Court of Appeals dealt with the issue of whether or not owners of vehicles impounded because they were illegally parked were given adequate notice their vehicles had been towed. The Fifth Circuit held the procedure for giving notice was sufficient where the sheriff's office attempted to contact the registered owner by phone on the day the vehicle was towed, where in only some cases, a notice was mailed to the registered owner, and where the vehicle owner could be informed of the tow by the sheriff's office if he called to report his vehicle missing or stolen.
[8] Thus, the only difference between an owner who received immediate notice and presented proof of insurance within three days and one who did not receive notice for several days is that the latter is liable only for each additional day's storage fee plus a $10.00 administrative fee.
[1] In State v. Schirmer, 646 So.2d 890 (La. 1994), one of the issues being decided by this Court was whether R.S. 18:1462(A)(2), which made "it a crime for any person to remain within 600 feet of a polling place `after having been directed, in writing,' by an election commissioner or law enforcement officer to leave the premises or area of a polling place," was constitutional. In deciding that the statute was unconstitutionally vague, this Court reasoned that "[t]he current subsection (2) of the statute, while criminalizing the refusal to leave a polling site after being instructed to do so by designated authorities, offers no guidelines to election commissioner or law enforcement officers regarding when it is proper to instruct a person to leave the vicinity of a polling site. Thus, the criminality of such conduct is a matter solely within the discretion of the official on the scene." Id. at 903. This Court further stated that "[w]hile the legislature may of course act to define criminal conduct, `it cannot constitutionally do so through the enactment and enforcement of a statute' whose violation may entirely depend upon whether or not a policeman is annoyed." Id. (citing Coates v. Cincinnati, 402 U.S. 611,91 S.Ct. 1686, 29 L.Ed.2d 214 (1971)).